UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EQUISTAR CHEMICALS, L.P., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-2608 |
| | § | |
| MASON MANUFACTURING, LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

**I.     INTRODUCTION**

Before the Court is the plaintiff's, Equistar Chemicals, L.P., ("Equistar"), motion for partial summary judgment and memorandum in support, and its reply to the defendants', Mason Manufacturing, Inc., and Mason Manufacturing, LLC ("Mason") response and memorandum. *See* [Dkt. Nos. 33, 41, and 39, respectively]. The Court received oral arguments on the motion and, after a careful review of the motion, response and exhibits, and consideration of the arguments, determines that Equistar's motion should be granted.

**II.    FACTUAL BACKGROUND**

This suit for breach of contract by Equistar against Mason arises out of a contract between the two whereby Mason agreed to manufacture and deliver replacement rectifier cans to Equistar for Equistar's distillation process at its Tuscola, Illinois petrochemical facility. Equistar sought and received bids for the work it required. Mason was the successful bidder and, thereafter, entered into contract negotiations with Equistar. To complete the contractual process, Equistar provided Mason contract specifications that Equistar deemed necessary to meet its needs. The specifications called for rectifier cans and lap rings with an interior diameter of 112 ¾ inches. The lap rings were to be manufactured in a manner that when installed on the rectifier

cans the internal diameter of the cans would be 112 ¾ inches.  Of significance is the fact that neither the Purchase Order nor the fabrication drawings contained specification for tolerances allowed in manufacturing the rectifier can.

Equistar employed URS to inspect the rectifier cans during the manufacturing process.  According to the evidence, URS inspected and approved the rectifier cans at each point of inspection even though the report does not specifically state what URS was approving during its inspections.  Specifically, the inspection reports do not state whether the internal diameter of the rectifier cans or the lap rings met specifications.  Because the rectifier cans were not manufactured with a zero tolerance the internal diameter of the rectifier cans did not meet Equistar's specifications.  Thereafter, Equistar employed Continental Fabricators to repair and/or remanufacture the rectifier cans in order that the existing trays might fit into the cans.  The suit resulted.

### III.  CONTENTIONS OF THE PARTIES

#### A.  *Equistar's Contentions*

Equistar contends that the contract between the parties is explicit in its terms.  In this regard, Equistar asserts that the contract consists of the Purchase Order, the approved drawings, the specifications contained in the drawings and the Lyondell Pressure Vessel Standard 220.  In addition to the terms of the contract, Equistar relies on one or more email transmissions that was sent to Mason before Mason commencing the project, cautioning Mason that the internal diameter of the rectifier cans were most important.  Thereafter, Mason acknowledged the approved engineering drawing that revealed internal dimensions of the lap rings at 112 ¾ inches.  Despite the undisputed facts and admissions by Mason's engineer(s) and officers, argues

Equistar, Mason offers no legal justification for failing to deliver conforming products based on the contract.

### B. Mason's Contentions

Mason contends that there are disputed fact issues in the case that obstruct the granting of Equistar's motion for partial summary judgment. In this regard, Mason argues: (a) it did not breach the contract; (b) the Purchase Order is ambiguous; (c) the contract does not specify an internal diameter for the rectifier cans; (d) Equistar never informed Mason that the existing trays to be installed in the rectifier cans were "friction fit" trays; (e) the affidavits of Equistar employees raise disputed facts on the "notice" issue; and (f) "custom and usage" in the industry provides that certain tolerances are allowed even though a contract does not reflect tolerances.

## IV. LEGAL STANDARD

State law rules of contract construction govern the interpretation of parties' contractual agreements. *Amica Mut. Ins. Co. v. Moak*, 55 F.3d 1093, 1095 (5th Cir. 1995) (citing *Barnett v. Aetna Life Ins. Co.*, 723 S.W.2d 663, 665 (Tex. 1987)). In interpreting a contract, courts will scrutinize the contract as a whole in an attempt to effectuate the intent of the parties as expressed in the written instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). "To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Coker*, 650 S.W.2d at 393 (citing *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 158 (1951) (emphasis omitted).

If the parties' written contract is worded such that "it can be given a certain or definite legal meaning or interpretation," it is unambiguous and will be construed as a matter of law. *Coker*, 650 S.W.2d at 393. "The mere disagreement of the parties upon the meanings of contract

terms will not transform the issue of law into an issue of fact." *D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.*, 957 F.2d 196, 199 (5th Cir. 1992) (citing *Gen. Wholesale Beer Co. v. Theodore Hamm Co.*, 567 F.2d 311, 313 (5th Cir. 1978). Only if a contract is doubtful or reasonably susceptible to multiple interpretations will it be deemed ambiguous. *Coker*, 650 S.W.2d at 393 (citing *Skelly Oil Co. v. Archer*, 356 S.W.2d 774, 778 (1962)). "The question of whether a contract is ambiguous, [however,] is one of law." *Toren v. Braniff, Inc.*, 893 F.2d 763, 765 (5th Cir. 1990). Only when a court finds ambiguity in a written contract, does the interpretation of the written instrument become a question of fact for the jury. *Id.* (citing *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex. 1987)).

V.   **DISCUSSION AND ANALYSIS**

The Court is of the opinion that the contract is unambiguous and therefore plainly expresses the intent of the parties. *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010); *see also Coker*, 650 S.W.2d at 393. It is undisputed that the exterior diameter of the lap rings is 113 ½ inches and that the shell section reflect a 3/8 inch clearance on either side of the trays – the shell section. Subtracting the shell section dimensions from the exterior dimensions of the lap rings results in an internal diameter of 112 ¾ inches. The Court holds that the internal diameter of the rectifier cans is not in dispute because internal diameter is the product of the difference between the exterior diameter of the lap rings and the clearance of 3/8 inch required in the shell section. Therefore, no contractual ambiguity exits. *See Addicks,* 596 F.2d at 294.

Mason argues, however, that it is impossible for the rectifier cans to be manufactured to exactly 112 ¾ inches in diameter. Mason asserts that some tolerance is necessary in the manufacturing process. Therefore, Mason argues, because Equistar failed to state tolerances for

the rectifier cans and the lap rings, Mason was permitted to include tolerances based on specifications from industry standards specifically the ASME standards and "other customers that have the same components in their specifications." Therefore, because no tolerances were noted for internal diameters for the lap rings or rectifier cans, Equistar was responsible to note the tolerances or that "friction fit" was a requirement. The Court disagrees.

The evidence appears to show that Mason actually manufactured lap rings that satisfied the terms of the contract. However, the evidence also shows that when the lap rings were attached to the rectifier cans, the lap ring would shrink resulting in an internal diameter below that required by Equistar. Mason knew that shrinking occurs during the welding process. Yet, Mason failed to inform Equistar of that shrinkage or otherwise compensate for shrinkage in the manufacturing process. As a result, all of the lap rings, once installed, resulted in internal diameters below 112 ¾ inches.

Despite the fact that Mason knew that Equistar would install its old trays in the rectifier cans, and that they did not fit due to shrinkage in the lap rings, Mason insists that it has met its obligations under the contract. This is so because it claims industry standards allow for tolerances. Dan Rennert, Mason's Engineering Manager, admitted, however, that no tolerances were reflected in Equistar's drawings. He also admitted that while tolerances may be reflected in the drawings and specification "notes", no tolerances were reflected for the lap ring except the thickness of the lap ring. Finally, Rennert admitted that the contract and drawings, in particular, stated that dimensional tolerances were to conform with Figure 1 and Figure 2 Lyondell Pressure Vessel Standard 220. Renner conceded that Mason was bound by Lyondell Standard and further conceded that the Lyondell Standard did not set out dimensional tolerances. The Lyondell Standard simply states that a minimum 5/8 inch clearance between the trays and the shell or

interior wall of the rectifier can is required to meet contract specifications. Moreover, The Lyondell Standard was a point of discussion between Renner and Equistar's Jimmy Nugent.

Other Mason officials do not dispute Rennert's testimony. For example, Bob McKinney testified that Mason was bound by the terms and conditions in the Purchase Order, the Lyondell Standard and the approved drawings. He admitted that the specifications in the drawings were correct. However, like Rennert, he stated that tolerances for a friction fit were not specifically stated and, therefore, ASME standards dictated acceptable tolerances. In other words, Mason placed industry standards for tolerances above the approved drawings. The Court concludes that by using ASME standards Mason violated the contract.

The contract did not allow Mason to look to industry standards in determining dimensional tolerances for the lap ring and rectifier cans. This is so because neither the drawings nor the Figures in the Lyondell Standard permitted variances contrary to those necessary for contract compliance. At the very beginning of the project, Mason received an email transmission cautioning Mason to give attention to the internal dimensional of the rectifier cans. Therefore, Mason's "custom and usage" defense fails because the express terms of the contract prevail over industry standards. *See* Tex. Bus & Comm. Code Ann. § 1.303(e)(1) (West. 2015); *see also Transcontinental Gas Pipeline Corp. v. Texaco, Inc.,* 35 S.W. 3d 658, 670 (Tex. App.—Houston [1st Dist] 2000, pet. denied).

## VI. CONCLUSION

The Court concludes that Mason had full and sufficient knowledge concerning the contractual requirements of Equistar. Yet, Mason failed to heed the terms of the contract, an email caution, and discussions between Equistar and Mason officials. Instead, Mason relied on "custom and usage" in manufacturing the lap rings and rectifier cans. Mason was obligated to

provide Equistar with rectifier cans with internal dimensions of 112 ¾ inches. It failed to meet its contractual obligations. Therefore, Equistar's motion for partial summary judgment is Granted. Remaining issues and trial dates will be discussed at the phone conference scheduled for September 29, 2015, at 3:00 p.m.

It is so Ordered.

SIGNED on this 24th day of September, 2015.

_____
Kenneth M. Hoyt
United States District Judge